**NATURAL RESOURCES DEFENSE COUNCIL, INC., a non-profit New York corporation, et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Respondent.

No. 72–2145.

United States Court of Appeals,
Ninth Circuit.

Nov. 11, 1974.

See also 9th Cir., 496 F.2d 1196.

Richard E. Ayres (argued), Natural Resources Defense Council, Washington, D. C., for petitioners.

Thomas C. Lee (argued), and James R. Moore, Attys. (argued), Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for respondent.

Before TRASK and SNEED, Circuit Judges, and LINDBERG,* District Judge.

## OPINION

TRASK, Circuit Judge:

Petitioners, the Natural Resources Defense Council, Inc. (NRDC), a nonprofit corporation, the Arizona Nurses' Association, also a nonprofit corporation, and Dr. Richard Abbuhl, individually, challenge the approval by the Environmental Protection Agency (EPA) of various portions of the implementation plan submitted by the State of Arizona under the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857 et seq. (the Act). This court's jurisdiction to entertain the challenge is founded upon Section 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1).[1]

The federal-state cooperative scheme of the Act has been well described elsewhere.[2] For present purposes, it is necessary only to reiterate briefly that the Act charges the EPA with responsibility for setting national primary and secondary ambient air quality standards,[3] and imposes upon the EPA the duty of ensuring that the implementation plans of the various states provide for both the attainment of these standards within the statutorily prescribed time periods and the maintenance of these levels thereafter. 42 U.S.C. §§ 1857c–4, 1857c–5. Petitioners contend that the EPA has breached this duty by approving those elements of the Arizona implementation plan[4] which (1) allow the State to grant variances in a manner unauthorized by the Act; (2) inadequately provide for the full disclosure of emissions data by individual sources of air pollution; and (3) provide for the issuance of permits for new and modified sources of pollution in a manner insufficient to guarantee the attainment and maintenance of national air standards.

Before appraising the merits of these substantive issues raised by petitioners, we shall first consider the standing of each petitioner to assert these arguments before this court.

### Standing

The Tenth Circuit, in a similar action brought by the NRDC to test the adequacy of the Colorado, New Mexico, and Utah implementation plans, dismissed the petition for lack of standing. Natural Resources Defense Council, Inc. v. EPA, 481 F.2d 116 (10th Cir. 1973).

---

* Honorable William J. Lindberg, Senior United States District Judge, Western District of Washington, sitting by designation.

1. "A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 of this title or section 1857c–6(d) of this title may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such `30th day."

2. See, e. g., Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390, 394–396 (5th Cir. 1974), petition for cert. filed, 42 U.S.L.W. 3654 (U.S. May 20, 1974) (No. 73–1742); Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 879 (1st Cir. 1973); Buckeye Power, Inc. v. EPA, 481 F.2d 162, 165–167 (6th Cir. 1973). See generally Luneburg, Federal-State Interaction Under the Clean Air Amendments of 1970, 14 B.C. Ind. & Com.L. Rev. 637 (1973).

3. National primary ambient air quality standards are those standards "the attainment and maintenance of which . . . are requisite to protect the public health." 42 U.S.C. § 1857c–4(b)(1). National secondary standards are those "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." Id. § 1857c–4(b)(2). For a description of what notions are embodied in the "public welfare" see id. § 1857h(h).

4. The Arizona implementation plan was prepared by a State executive agency based upon the authority of an enabling statute, Ariz.Rev.Stat. § 36–1700 et seq. (West Supp. 1973). Since the Act requires the State's implementation plan to be consistent with the federal statute, 42 U.S.C. § 1857c–5, a fortiori the State statute may not permit inconsistencies with federal requirements. Accordingly, this court must assess the adequacy under federal law of both the Arizona statute and the derivative implementation plan.

The court refused to read into Section 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1), a standing requirement more liberal than that applied by the Supreme Court in other cases in which standing to sue was predicated upon a specific statutory authorization. 481 F.2d at 120–121. We agree with this construction of section 307(b)(1). Given the inexorable interrelationship between standing and the constitutional prerequisites of federal jurisdiction under Article III of the Constitution, Flast v. Cohen, 392 U.S. 83, 98, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), we are unable to accept the NRDC's contention that the statute could confer standing without a prior showing of "injury in fact." *See* Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 151–152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Nor does the legislative history of the section demonstrate, as the NRDC avers, that this is what Congress intended when it established this mode of review for EPA decision-making.[5]

The Supreme Court, in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *Data Processing, supra,* has required litigants who assert standing based upon an enabling statute (as here) to demonstrate that they have suffered an "injury in fact" *and* that this injury is "arguably within the zone of interests" to be protected by the applicable statute. *Sierra Club, supra* 405 U.S. at 732–733, 92 S.Ct. at 1365; *Data Processing, supra* 397 U.S. at 152–153, 90 S.Ct. 827. The "injury in fact" requirement necessitates a showing that the party seeking review be himself among the injured. *Sierra Club, supra* 405 U.S. at 735, 92 S.Ct. 1361. Neither petitioners nor respondent has seen fit to enlighten the court with respect to the identity of the "petitioners," their relationship to the State of Arizona, if any, or just how they or any of them are among those who might be injured by any deficiency in the Arizona State implementation plan. The Petition for Review cryptically states in its entirety:

"Natural Resources Defense Council, Inc., Project on Clean Air; Dr. Richard Abbuhl; the Arizon [*sic*] State Nurse's Association petition this court for review of the rules and regulations promulgated by respondent (37 Fed. Reg. 10842 [May 31, 1972], 40 CFR Part 52, Subchapter C) insofar as they

---

5. In arguing that the statute bestows a "standing" which does not require the assertion of "injury in fact," petitioners rely upon the following passage from the applicable Senate report:

"One of the uncertainties in the existing Clean Air Act is the availability or opportunity for judicial review of administratively developed and promulgated standards and regulations . . . .

"Administratively developed standards, rules and regulations under the Act and under this bill would clearly affect the interests of persons. The courts are increasingly adapting this test to what administrative actions are reviewable. In several recent cases [Environmental Defense Fund, Inc. v. Hardin, [138 U.S.App.D.C. 391, 428 F.2d 1093] (C.A. No. 23,813, May 28, 1970); Barlow v. Collins (397 U.S. 159, 167, [90 S.Ct. 832, 25 L.Ed.2d 192] (1970); Abbott Laboratories v. Gardiner [*sic*] (387 U.S. 136, 140–141 [87 S.Ct. 1507, 18 L.Ed.2d 681] (1967))] the Courts have held that even in matters committed by statute to administrative discretion, preclusion of judi-

cial review 'is not lightly to be inferred . . . it requires a showing of clear evidence of legislative intent.' (E. D. F. v. Hardin, supra, p. 7.) The Courts have granted this review to those being regulated and to those who seek 'to protect the public interest in the proper administration of a regulatory system enacted for their benefit.' (E. D. F. v. Hardin supra p. 6.) Since precluding review does not appear to be warranted or desirable, the bill would specifically provide for such review within controlled time periods." S.Rep.No.91–1196, 91st Cong., 2d Sess. 40–41 (1970). We read the quoted passage as germane only to the legislative determination that judicial review of the EPA's approval of the various state implementation plans should be expressly made available. Thus, the statement relates only to the *fact* of judicial review, and does not purport to specify *who* may petition for such review. A reading of the cases cited in the report confirms this interpretation. *See, e. g.,* Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1096–1098 (1970).

approve the state air pollution implementation plan for the state of Arizona."

We therefore requested additional briefs addressed to the critical jurisdictional question that we raised sua sponte. Respondent argued that no sufficient showing had been made and requested that the petition be dismissed. Petitioners, without seeking to amend their petition or supplement the record, see Fed.R. App.P. 16(b), simply described themselves in an unverified memorandum as follows: (1) The National Resources Defense Council, with offices in Palo Alto, California; New York City, New York; and Washington, D.C., is a New York nonprofit corporation that comprises approximately 16,000 members, 107 of whom are residents of Arizona. There has been no allegation or showing on the record in this court that the Arizona members have either requested to be represented or consented to be represented by the NRDC in this action. (2) The Arizona Nurses' Association is a nonprofit Arizona corporation with approximately 2,300 nurses as members throughout the State of Arizona. The memorandum states that "[t]he Association testified" at some of the public hearings on the Arizona State implementation plan. (3)

Dr. Abbuhl is a resident and medical practitioner of Phoenix, Arizona.

■■■ While the Arizona resident members of the nonprofit organizations breathe the air of the State and their health and well-being may be affected by pollutants in the air, the constituent corporations neither breathe the air nor is their corporate health affected by it.[6] On the basis of the record before us we are unconvinced that the NRDC has sufficiently asserted or made a showing within Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), to qualify as possessing standing. In a supplemental statement, it is alleged that some of the nurses of the Arizona Nurses' Association participated in the Arizona hearings, but on the basis of the petition it is doubtful if this corporation is in any better position than the NRDC. There is no doubt, however, that Dr. Abbuhl, as a resident of Arizona, will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act. See United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); id. at 703, 93 S.Ct. 2405 (Douglas, J., dissenting in part). On this basis, we are satisfied that there is sufficient individual interest presented in this petition for review to allow us to

---

6. In Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Court stated that:

"[i]t is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." 405 U.S. at 739, 92 S.Ct. at 1368. We note that, in most instances where standing has been accorded to an organization, it is to an unincorporated association whose members, individually and collectively, themselves constitute the organization. This is to be contrasted to the legal corporation, either profit or nonprofit, which is an artificial entity separate and apart from its membership that exists solely by virtue of a charter issued by the state of incorporation. The quoted reference of the Court in Sierra Club, supra, is followed by the citation of NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), wherein the NAACP is described as a nonprofit membership corporation. Id. at 419, 83 S.Ct. 328. The Court stated that

"though a corporation," the NAACP was itself directly engaged in the activities that the state statute would proscribe; it also expressed the opinion that the corporation had standing to assert the corresponding rights of its members. Id. at 428, 83 S.Ct. 328. This "representative standing" was immediately assignable to the nature of the constitutional right asserted in Button, freedom of association, and the Court's recognition that, "in every practical sense," the NAACP and its members are "identical." See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Whatever may the standing of legal corporations, profit or non-profit, to represent 'members' who suffer an injury in fact, the allegations here, however, as were the allegations in Sierra Club, are entirely inadequate to sustain claims by these corporations either for themselves or, in representative capacities, for their individual members.

go forward. The petition is dismissed, however, as to petitioners NRDC and the Arizona Nurses' Association.

With this preliminary jurisdictional inquiry aside, we may now address seriatim the specific objections of petitioner Abbuhl to the Arizona implementation plan.

### Variances

Under the Arizona statute, any individual source of pollution may apply for a "conditional permit" allowing the source to vary from the requirements of the State's implementation plan. Such variances may be granted if "additional time is needed for compliance and . . . the conditional permit, if granted, will not unduly endanger human health or safety either directly or indirectly." Ariz.Rev.Stat. § 36–1712 (West Supp. 1973). Petitioner advances three reasons why this provision should have been disapproved by the EPA as inconsistent with the dictates of the Act. First, this procedure allegedly circumvents the only express mechanism in the Act through which individual exemptions from the requirements of a state's implementation plan may be granted. Secondly, petitioner contends that this element of Arizona's plan improperly interjects economic considerations into the State's program through which national air quality standards are to be attained and maintained. Finally, petitioner asserts that this provision may interfere with Arizona's ability to regulate in conformity with these standards new and modified sources of pollution. For the reasons hereinafter set forth we reject these contentions of petitioner.

According to petitioner, an individual source of pollution may secure a vari-

ance from any requirement of a state's implementation plan only by application to the EPA, by the governor of the state in question, for a "postponement" under Section 110(f) of the Act, 42 U.S.C. § 1857c–5(f). The EPA, responding to this argument in earlier challenges to the Agency's approval of state plans containing similar allowances for variances, construed section 110(f) as relevant only to those exemptions from a state plan that would preclude the attainment or maintenance of national ambient air standards. Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 886 (1st Cir. 1973). The EPA viewed the Act as enabling a state to grant "variances," subject to approval by the EPA, for reasons other than those denominated in section 110(f) as long as such variances were minor, i. e., did not inhibit national air quality standards. Id. The EPA has since acceded to an intermediate interpretation, articulated by the First Circuit in Natural Resources Defense Council, Inc., supra, that would require mandatory resort to section 110(f), for such minor variances, only in the so-called "postattainment" period, i. e., the period after May 31, 1975, the point at which national primary ambient air standards are to be achieved.[7] It is this construction that the EPA asserts here.

The First Circuit, in reasoning that has since been adopted by the Second and Eighth Circuits, Natural Resources Defense Council, Inc. v. EPA, 494 F.2d 519, 523 (2d Cir. 1974); Natural Resources Defense Council, Inc. v. EPA, 483 F.2d 690, 693–694 (8th Cir. 1973), categorized as the "preattainment" period that time within which the states must achieve national primary ambient air standards, viz., "as expeditiously as practicable" but in no case later than 3

---

7. The EPA's decisions regarding the implementation plans of the various states were announced on May 31, 1972. 37 Fed.Reg. 10,842 et seq. (1972). For those states whose plans were approved at that time, the national primary standards are, accordingly, to be attained by no later than May 31, 1975. See 42 U.S.C. § 1857c–5(a)(2)(A)(i). Since the entire Arizona plan was not approved at that

time, and one of the State's air quality control regions was granted a 2-year extension regarding the attainment of national standards for carbon monoxide, the May 31, 1975, deadline is not precisely accurate for Arizona. See 37 Fed.Reg. 10,849–50 (1972). This distinction is irrelevant for the purposes of deciding the substantive issues of statutory construction involved in this suit.

years beyond the date on which the state implementation plan is approved by EPA. 478 F.2d at 885. Reading the "as expeditiously as practicable" language of 42 U.S.C. § 1857c–5(a)(2)(A)(i) as indicative of a congressional intent to allow the states a measure of flexibility during this period, the court accepted the EPA's allowance of a state's variance procedure, similar to that at issue here, during this preliminary period.[8] 478 F.2d at 887. The court declined, however, to recognize the availability of such flexibility after May 31, 1975. Rather, the court viewed section 110(f) of the Act as the exclusive means intended by Congress to vary any requirement of a state plan after the attainment date; any other procedure might "invite protracted delay." Id. at 886. Yet the court acknowledged that some brief and minor variances might be acceptable after this time, without reference to section 110(f), for "mechanical breakdowns and acts of God." Id.

■ We do not agree with this interpretation of the Act. While the First Circuit recognized, 478 F.2d at 887, that any variance, whenever sought, which would affect the attainment or maintenance of a national ambient air standard (i. e., a "major" exemption) necessarily can be effected only through the express procedures of section 110(f), and only for the reasons stated in that section, there is no statutory basis for treating minor variances differently in the "preattainment" and "postattainment" periods. Indeed, given the First Circuit's restrictive reading of the Act as applicable in the postattainment period, it appears inconsistent for that court to acknowledge the need for minor variances, effected in

the postattainment period without recourse to section 110(f), for mechanical breakdowns and acts of God. The statute lends itself only to one of two alternatives: either minor variances are possible at any time without recourse to section 110(f), or section 110(f) must be followed for any and all exemptions from a state's implementation plan.[9]

■ We read the legislative history of section 110(f) as demonstrative of a congressional intent to have that section apply only in those cases in which a particular variance would prevent the attainment or maintenance of a national ambient air standard. The origin of section 110(f) was section 111(f) of the Senate version of the Act. A portion of the relevant commentary from the Senate report concerning this provision is particularly instructive:

"Finally, the Committee would recognize that compliance with the national ambient air quality standards deadline may not be possible. If a Governor judges that any region or regions or portions thereof within his State will not meet the national ambient air quality standard within the time provided, the bill would authorize him—one year before the deadline—to file a petition against the United States in the District Court of the United States for the district where such region or portion thereof is located for relief from the effect of such expiration." S.Rep.No.91–1196, 91st Cong., 2d Sess. 14–15 (1970). See also id. at 55–56; 116 Cong.Rec. 33,117 (1970) (remarks of Senator Cooper).

After Conference, this provision became part of the Act, with only a slight, procedural alteration.[10] That this section

---

8. The court rejected the EPA's contention that this authority was based upon 42 U.S.C. § 1857c–5(a)(3), which allows the EPA to approve "revisions" in a state's implementation plan. 478 F.2d at 887.

9. Section 110(f) speaks of the postponement from "any" requirement of a state's implementation plan. If the First Circuit's interpretation holding this section applicable to minor as well as major variances is correct,

then section 110(f) should encompass all exemptions, major or minor, whenever made. See Comment, Variance Procedures under the Clean Air Act: The Need for Flexibility, 15 Wm. & Mary L.Rev. 324, 332 (1973).

10. The provision was changed to require the governor's application for postponement to be submitted to the EPA rather than to a U.S. district court. See H.R.Rep.No.91–1783, 91st Cong., 2d Sess. 45 (1970), U.S.Code Cong. & Admin.News p. 5374. (Conference report.)

was intended to encompass only "major" modifications of a state's plan—modifications that would inhibit a national standard within a particular air control region—is reaffirmed by the Conference report and the Senate debates accompanying the passage of the Act.[11]

■ We must now consider whether or not the Act contemplates the issuance by states of "minor" variances, subject always to EPA approval. We agree with the First Circuit that such flexibility, during what that court termed the preattainment period, is indicated by the employment of the term "practicable" in 42 U.S.C. § 1857c–5(a)(2)(A)(i).[12] We extend this rationale, however, to the time after national standards are to be achieved. Without such an interpretation, it is difficult to perceive any just

basis for the Act's exhortation to the states to promulgate implementation plans even stricter than that required to attain national ambient air standards. See 42 U.S.C. § 1857d–1. As long as a possible variance from a state plan will not preclude the attainment or maintenance of such standards, we discern no legislative intent to commit a state, in toto, to its initial plan, without any flexibility whatsoever.[13] To be sure, we recognize that the Act intends a policy of "nondegradation," i. e., those geographic areas enjoying air quality superior to that mandated by the Act are not to be made to suffer a reduction in such quality to national standards. Sierra Club v. Ruckelshaus, 344 F.Supp. 253, 255–257 (D.D.C.1972), aff'd per curiam, No. 72–1528 (D.C.Cir. Nov. 1, 1972), aff'd by an equally divided Court sub nom. Fri v.

11. In discussing section 110(f) of the conference bill, which was enacted as the 1970 Act, the Conference Committee reported:

"Under the Senate amendment each State was to hold public hearings and adopt a plan to implement the national ambient air quality standards (or the more stringent State standards) and national ambient air quality goals. The Administrator was required to approve the plan if he found that it provided for attainment of the standard within three years from the date of approval of the plan. *The Governor of a State, however, was authorized to petition the Federal district court to extend for a year the period for attaining a standard.* The court could grant relief only upon specified showings and each one-year extension could be granted only after the filing of a new petition and making the required showings. . . .

"The conference substitute follows the Senate amendment in establishing deadlines for implementing primary ambient air quality standards but leaves the States free to establish a reasonable time period within which secondary ambient air quality standards will be implemented. *The conference substitute modifies the Senate amendment in that it allows the Administrator to grant extensions for good causes shown upon application by the Governors.*" *Id.* U.S.Code Cong. & Admin.News 1970, p. 5377 (emphasis added).

The floor manager of the bill described the provision at issue here as follows:

"Section 110 requires each State to develop an implementation plan which assures the attainment of the primary ambient air qual-

ity region within three years from the date the plan is approved. The plan also must provide for reaching the generally more restrictive levels of air pollution of the secondary standards within a reasonable set time period. . . .

"If, at the time of plan approval, it appears impossible to bring specific sources into compliance within three years, the Governor of the State may request an extension of the deadline up to two years. The Administrator must be satisfied that alternate means of achieving the standard have been considered (including closing down the source in question), that all reasonable interim measures will be applied and that the State is justified in seeking the extension.

"A Governor may also apply for a postponement of the deadline if, when the deadline approaches, it is impossible for a source to meet a requirement under an implementation plan, interim control measures have reduced (or will reduce) the adverse effects of the source, and the continued operation of the source is essential to national security or the public health or welfare of that State." 116 Cong.Rec. 42,384–85 (1970) (remarks of Senator Muskie).

12. Moreover, the Act permits each state to set its own "reasonable" time within which national secondary standards must be realized. 42 U.S.C. § 1857c–5(a)(2)(A)(ii).

13. The lack of flexibility is ensured by our perception of the legislative history of section 110(f) as encompassing only "major" deviations from a state implementation plan.

Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973) (per curiam). Yet even here a measure of flexibility was written into the Act: the states are to provide for the maintenance of such superior air quality "to the maximum extent *practicable.*" S.Rep.No.91–1196, 91st Cong., 2d Sess. 11 (1970) (emphasis added).

 Petitioner argues strenuously that the Act's conception of "practicability" does not include considerations of economic cost and technological feasibility. Indeed, the portions of the legislative history relied upon by petitioner, as well as several other references in the reports and debates, clearly evince a legislative intent to realize national ambient air standards despite economic cost and in spite of the possibility that some business enterprises, unable to comply with a state's plan so as to enable that state to attain national standards within the prescribed time period, might have to terminate operations.[14] We do not believe, however, that the Act forestalls consideration of economic and technological feasibility when a variance that will not interfere with national ambient air

standards is contemplated. *See also* Natural Resources Defense Council, Inc. v. EPA, 483 F.2d 690, 694 (8th Cir. 1973); Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 888–889 (1st Cir. 1973). Accordingly, we hold that the EPA properly approved the Arizona "conditional permit" system that allows variances, as long as the public health or safety will not be unduly endangered, if "additional time is needed for compliance" with a particular requirement of the State's implementation plan.

 While finding that the Act permits the adoption of a state "variance" system similar to that contained in the Arizona implementation plan, we nevertheless stress that the ultimate arbiter of the propriety of any particular variance is and must be the EPA. *See* Getty Oil Co. (Eastern Operations) v. Ruckelshaus, 467 F.2d 349, 358 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). Thus, should the State of Arizona grant a "minor" variance that does, in fact, alter the attainment or maintenance of a national ambient air standard, the EPA is bound to disapprove this modification of the

---

**14.** The proponents of the Senate bill adamantly stressed that the national primary and secondary air quality standards were to be established and realized without regard to economic and technological feasibility:

"In the Committee discussions, considerable concern was expressed regarding the use of the concept of technical feasibility as the basis of ambient air standards. The Committee determined that 1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of pollution load in many areas, even with application of available technology, would still be deleterious to public health.

"Therefore, the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down, and in addition that new sources should be controlled to the maximum extent possible to prevent atmospheric emissions." S.Rep.No.91–1196, 91st Cong., 2d Sess. 2–3 (1970). *See* 116 Cong. Rec. 32,901–02, 32,904, 32,906, 32,918–22, 33,099, 33,115 (1970).

By contrast, the House version of the 1970 Act allowed consideration of economic and technological feasibility in enforcement proceedings arising when national standards were not met. H.R.Rep.No.91–1146, 91st Cong., 2d Sess. 9 (1970). The strict substantive prerequisites of Section 110(f) of the Act, which accords the exclusive mechanism whereby a state's plan may be altered to allow noncompliance with a national ambient air standard beyond the prescribed time periods, indicates that the approach of the Senate prevailed in Conference. *See* H.R.Rep.No.91–1783, 91st Cong., 2d Sess. 44–45 (1970) (Conference report); 116 Cong.Rec. 42,381–82, 42,384–85, 42,519, 42,523–24 (1970); Hearings on Implementation of the Clean Air Act Amendments of 1970 Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 92d Cong., 2d Sess., pt. 1, at 18–19, 21, 24 (1972). *Contra,* Buckeye Power, Inc. v. EPA, 481 F.2d 162, 168–169 (6th Cir. 1973). Nonetheless, nowhere in this history is there support for the contention that variances may not be granted based upon factors of cost and technology when the individual variance contemplated will *not* hamper the attainment or maintenance of national ambient air standards.

State implementation plan unless the explicit procedures of section 110(f) are followed and the modification is justified under that section. Indeed, until any variance is sanctioned by the EPA, any source operating in contravention of a state implementation plan that has been approved by that Agency is subject to forced compliance at the instance of the EPA. *See Getty Oil Co., supra;* 42 U.S.C. § 1857c–8. Since no variance is operative without EPA approval, we do not agree with the First Circuit that the allowance of such variance procedures, in the postattainment period, will "invite protracted delay." Pending final approval of the variance by the EPA, the individual source is committed to the emissions standards enumerated in the original or previously revised [15] state plan. Moreover, we fail to see how exclusive reliance upon the procedural and substantive hurdles of section 110(f) would facilitate a prompt determination on any particular sought-after variance. *See* Comment, Variance Procedures Under the Clean Air Act: The Need for Flexibility, 15 Wm. & Mary L.Rev. 324, 334–36 (1973).

We are not unaware that the Fifth Circuit has recently accepted petitioner's construction of the Act. Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390 (5th Cir. 1974), cert. granted, sub nom NRDC Inc. v. Train, —— U.S. ——, 95 S.Ct. 39, 42 L.Ed.2d 46 (No. 73–1742); *see also* Buckeye Power, Inc. v. EPA, 481 F.2d 162, 167 (6th Cir. 1973) (dictum). With that court, we acknowledge that resort to the legislative history of a statute is unwarranted when the terms of the statute are clear and unambiguous. United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); Easson v. Commissioner, 294 F.2d 653, 656–657 (9th Cir. 1961); Gilbert v. Commissioner, 241 F.2d 491, 494 (9th Cir. 1957). To be sure, the express language of section 110(f), standing alone, is not ambiguous.[16] Yet, the failure of the Act to define "revision," as used in 42 U.S.C. § 1857c–5(a)(3), and to indicate what notions are embodied in the "as expeditiously as practicable" language of 42 U.S.C. § 1857c–5(a)(2)(A)(i), create a lack of clarity in meaning when those sections are juxtaposed with section 110(f) as construed by petitioner and the Fifth Circuit. The words of the statute, in toto, give rise to a "legitimate doubt" as to the meaning intended, and, therefore, justify resort to the legislative history. Maun v. United States, 347 F.2d 970, 976 (9th Cir. 1965). As stated, we do not see in this history a congressional intent to establish section 110(f) as the exclusive mechanism by which *all* changes of particular application may be accomplished. *Compare* Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390, 401 (5th Cir. 1974). Further, since we believe that the EPA's "revision" authority of 42 U.S.C. § 1857c–5(a)(3) is not the statutory basis for the allowance of variance procedures such as those at issue here,[17] the semantic differences surrounding the various generally accepted definitions of "postponement," "revision," and "variance" are irrelevant. This fact, in addition to our different interpretation of the legislative history of the Act, marks the point of departure

---

**15.** We speak here of a modification that has already been approved by the EPA.

**16.** "Prior to the date on which any stationary source . . . is required to comply with any requirement of an applicable implementation plan the Governor . . . may apply to the Administrator to postpone the application of such requirement . . . ." 42 U.S.C. § 1857c–5(f)(1).

**17.** Rather, we discern the statutory toleration of such flexibility as a "necessary adjunct to the statutory scheme" when this Act is examined in conjunction with its legislative history. *See* Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875, 887 (1st Cir. 1973). Moreover, we are not persuaded that the congressional intent to allow a measure of flexibility in the attainment of national primary standards, subject to mandatory attainment within 3 years, bears no correlation to a permissible flexibility in the enforcement of a state's emissions standards as set forth in its implementation plan. *Compare* Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390, 402–403 (5th Cir. 1974). It is through the emissions standards of the various states that the national ambient air standards are to be achieved. *See* 42 U.S.C. § 1857c–5(a)(2)(B).

between our reasoning and that of the Fifth Circuit. *See Natural Resources Defense Council, supra,* 489 F.2d at 401.

■ In so construing the Act, we have adopted an interpretation asserted neither by petitioner nor respondent here.[18] It is our duty, however, to apply the statute in accordance with what we perceive to be the congressional intent underlying the Act. Woods v. Benson Hotel Corp., 177 F.2d 543, 546 (8th Cir. 1949); Miller v. Burger, 161 F.2d 992, 994 (9th Cir. 1947); *see* FTC v. Texaco, Inc., 393 U.S. 223, 226, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); Rachal v. Allen, 376 F.2d 999, 1002–1004 (5th Cir. 1967). Under usual circumstances, we would accord "great deference" to the interpretation of the EPA, the administrative agency responsible for enforcing the statute. *E. g.,* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). But we feel less bound by this principle when the EPA interpretation is, as here, merely an accession to a previous judicial decision. Indeed, the construction we adopt is more in tune with the original EPA interpretation[19] that has since been abandoned after the First Circuit's decision in Natural Resources Defense Council, Inc. v. EPA, 478 F.2d 875 (1st Cir. 1973).

■ The EPA has informed this court that it intends to revoke its approval of the Arizona plan insofar as that plan allows state variance during the First Circuit's "postattainment" period. The appropriate administrative processes that, if Arizona failed to modify its plan accordingly, would eventually culminate in the EPA's promulgation of a substitute, under 42 U.S.C. § 1857c–5(c), have already begun. Our decision here does not foreclose the adoption by the State of Arizona of an implementation plan that forbids the issuance of variances through means other than that prescribed in section 110(f), 42 U.S.C. § 1857c–5(f), after that date on which national ambient air standards are to be achieved. The Act expressly authorizes the states to devise implementation plans stricter than required to maintain national air quality standards. 42 U.S.C. § 1857d–1. Our interpretation of the Act, however, precludes the EPA's rejection of a state plan which contains a provision for variances similar to that at issue here and which is enforced in a manner wholly consistent with the policies underlying the federal statute. Additionally, the EPA may not exercise its authority under 42 U.S.C. § 1857c–5(c) to promulgate a substitute plan for the State of Arizona that, contrary to the intent expressed in the State statute or implementation plan, proscribes the issuance of "minor" variances[20] under a procedure other than that specified in section 110(f).

■ Petitioner's final objection to the inclusion within the Arizona plan of a "conditional permit" or variance provision is the assertion that the procedure would undermine the State's obligation to prevent any interference with national ambient air standards by new and modified sources of pollution. 42 U.S.C. § 1857c–5(a)(2)(D), (4). Under petitioner's theory, any conditions, designed to protect national air quality standards, that have been incorporated within a state permit required before a new source is constructed or an existing source is modified may be circumvented by subsequent application for a "conditional permit." Since we conclude, however, that any such permits would not be

---

**18.** The EPA has argued the position of the First Circuit, *i. e.,* that "minor" variances are possible without recourse to section 110(f) only in the preattainment period. Petitioner, on the other hand, has contended that any and all variances, whenever made, must be implemented pursuant to the specific strictures of section 110(f). As discussed above, we hold that section 110(f) need not be consulted at all for "minor" variances that will not inhibit national air quality standards. *See* note 20 *infra.*

**19.** *See* 36 Fed.Reg. 22,405 (1971); 40 C.F.R. § 51.32(f) (1973).

**20.** We reiterate that by "minor" we mean variances that will not interfere with the attainment or maintenance of national ambient air quality standards.

effectual until sanctioned by the EPA, and that the EPA could not approve such a variance—if such a modification would prevent the attainment or maintenance of a national ambient air standard—unless the procedural and substantive requirements of section 110(f) were met, this argument is without merit.

### Confidentiality

 The EPA approved the following provision for confidentiality within the Arizona air pollution control statute:

"Any records or other information furnished to or obtained by the director concerning one or more air pollution sources, which records and information relate to production or sales figures or to the processes or production unique to the owner or operator, or which would tend to adversely affect the competitive position of such owner or operator, shall be only for the confidential use of the director in the administration of this chapter, unless such owner or operator shall expressly agree to their publication or availability to the public. No provision of this section shall be construed to prohibit the appropriate governmental agency from publishing quantitative and qualitative statistics pertaining to the emission of pollutants." Ariz.Rev.Stat. § 36–1708, subd. D (West Supp.1973).

We believe that the last sentence of this quoted section of the statute clearly and adequately ensures public access to emissions data within the State of Arizona, as required by 42 U.S.C. §§ 1857c–5(a)(2)(F)(iii), (iv). *Compare* Natural Resources Defense Council, Inc. v. EPA, 494 F.2d 519, 522 (2d Cir. 1974); Natural Resources Defense Council, Inc. v. EPA, 489 F.2d 390, 396–397 (5th Cir. 1974). Petitioners' assertion that the EPA acted inconsistently in approving this element of the Arizona plan, while simultaneously rejecting "virtually identical" provisions in the Kansas and Kentucky implementation plans, is without merit.[21]

 As with the approval by the EPA of Arizona's statutory scheme regarding new and modified sources of pollution (to be examined *infra*), the appropriate standard of review in appraising the EPA's sanction of Arizona's confidentiality provision is that contained in 5 U.S.C. §§ 706(2)(A)–(D) and applied in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Delaware Citizens for Clean Air, Inc. v. EPA, 480 F.2d 972, 975–976 (3d Cir. 1973); Appalachian Power Co. v. EPA, 477 F.2d 495, 504–507 (4th Cir. 1973). Since we cannot say that the EPA's determination here was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it must be sustained under 5 U.S.C. § 706(2)(A).[22]

---

**21.** The Kansas and Kentucky statutes provided that any "analyses or summaries relating to the general condition of the outdoor atmosphere" that were prepared from data submitted by individual sources of pollution could not "identify, directly or indirectly, any owner or operator or reveal any information otherwise confidential under this section." Law of April 24, 1967, ch. 347, § 15, [1967] Laws of Kan. p. 668, as amended Kan.Stat Ann. § 65–3015 (Supp.1973); *accord* Act of Mar. 8, 1966, ch. 22, § 10, [1966] Ky.Acts p. 173, as amended Act of June 27, 1972, ch. 3, § 20, [1972] Ky. Acts 1st Extra Sess. p. 19. No exception authorizing disclosure of emissions data, as present in the Arizona statute, was contained in these laws.

**22.** Subsequent to the EPA approval of the Arizona plan, the EPA acknowledged that the plan itself may not sufficiently implement the

policy of disclosure of emissions data that is required by the Arizona statute:

"The pertinent section of the Arizona Plan (Sec. 2.6) speaks of the necessity of an amendment to the statute, rather than providing that such emissions reports shall be made available, and, therefore, the Administrator, upon reconsideration, has no alternative but to direct revision of the Arizona Plan in this respect. This will be done as promptly as possible." Brief of Respondent at 24.

We have been advised by the EPA that appropriate administrative proceedings to achieve the necessary clarification of the Arizona plan have been initiated and are continuing during the pendency of this action. Since we read the Arizona statute to provide the degree of disclosure mandated by the Act, we do not find that the EPA acted erroneous-

### Regulation of New and Modified Sources

■ Petitioner's final objections to the Arizona implementation plan relate to the procedures intended to regulate in conformity with the Act the construction and modification of new and existing sources of pollution. The Act requires that each state include within its plan a "review" procedure designed to ensure that any proposed construction or modification of sources will not inhibit the attainment or maintenance of national ambient air standards. 42 U.S.C. §§ 1857c–5(a)(2)(D), (4). The relevant portion of the Arizona statute declares:

"A new industry hereinafter established shall not begin normal operation until it has secured a permit attesting that its operation will not cause pollution in excess of the standards *set by the state board of health.*" Ariz.Rev. Stat. § 36–1700, subd. B (West Supp. 1973) (emphasis added)."

In litigation testing the adequacy of the Iowa implementation plan, the EPA admitted that its approval of a provision [23] similar to that quoted above was improper. Natural Resources Defense Counsel, Inc. v. EPA, 483 F.2d 690, 694 (8th Cir. 1973). This confession of error was based upon a recognition of the Iowa plan's failure explicitly to forestall any interference with *national* air quality standards. Since the Arizona provision seeks to guarantee the operation of new sources consistent only with "standards set by the state board of health," it seems subject to the same infirmity as that which caused the invalidation of the

applicable provision in the Iowa plan. Accordingly, the EPA's approval of this element of the Arizona plan must be set aside in order to effectuate the "reasonable" agency decisionmaking required by 5 U.S.C. § 706(2)(A). Indeed, the EPA has informed the court that administrative action is currently in progress to revise the Arizona regulations appropriately. We direct the EPA to discharge fully its responsibilities under the Act so as to ensure the development of an Arizona plan that gives proper regard to national air quality standards when considering permits for new and modified sources of pollution. *See* 42 U.S.C. §§ 1857c–5(a)(2)(D), (4); *id.* §§ 1857c–5(a)(3), (c)(2)–(3).

■ Petitioner's argument that Arizona's new- and modified-source regulations do not mandate continuing compliance with the State's "control strategy,"[24] as required by 40 C.F.R. § 51.18(d), is without merit. The Arizona statute provides:

"The director shall deny an installation permit or an operating permit if the applicant does not show that every such machine, equipment, incinerator, device or other article . . . , the use of which may cause or contribute to air pollution, . . . is so designed, controlled, or equipped with such air pollution control equipment, that it may be expected to operate without emitting or without causing to be emitted air contaminants in violation of the provisions of this article *and the rules and regulations* adopted by the [board of health]." Ariz.Rev.

ly in originally approving the Arizona plan. We presume, however, that the Arizona plan will be modified in a timely manner to reflect expressly the unconditional availability of emissions data which is allowed under the Arizona statute. *See* 42 U.S.C. §§ 1857c–

23. "The department shall:

"7. Grant . . . permits . . . for the installation of new equipment capable of emitting air contaminants to produce air pollution as defined herein . . . .

"a. No equipment which may cause or contribute to air pollution as defined herein

 . . . shall be installed, altered in such a way that it significantly affects operational efficiency, or placed in use unless a permit has been issued for such equipment." Iowa Code Ann. § 136B.5 (Supp.1972), as amended, Iowa Code Ann. § 455B.13 (Supp. 1974).

.24. The term "control strategy" is defined by the EPA as "a combination of measures designated to achieve the aggregate reduction of emissions necessary for attainment and maintenance of a national standard . . . . " 40 C.F.R. § 51.1(n).

Stat. § 36–1707.02, subd. A (West Supp.1973) (emphasis added).[25]

The operating permits that are to be issued by the Arizona authorities must be renewed annually "subject to compliance with the rules and regulations and the provisions of [the Arizona statute] . . . ." Ariz.Rev.Stat. § 36–1707.01, subd. D. (West Supp.1973). We are satisfied that these provisions, which must be administered in a manner calculated to attain and maintain national ambient air quality standards, amply comport with the requirements of 40 C.F.R. § 51.-18(d). See Natural Resources Defense Council, Inc. v. EPA, 483 F.2d 690, 695 (8th Cir. 1973).

The EPA is directed to secure the development of an Arizona implementation plan in conformity with the views expressed in this opinion.

---

**25.** Further, the implementation plan drafted in accordance with this statute expressly states that "[a]pproval of such a permit will not absolve the owner of the responsibility to continue to comply with applicable standards or rules and regulations." Arizona Implementation Plan at 9–3, in Brief of Respondent, Appendix B, at 42.