Reubin BAILEY, Appellant

v.

PRESERVE RURAL ROADS OF MADISON COUNTY, INC., AND CURTIS TATE, Appellees.

No. 2009–SC–000417–DG.

Supreme Court of Kentucky.

Dec. 22, 2011.

David Michael Ward, Nanci Marian House, White, McCann & Stewart, PLLC, Winchester, KY, for appellant.

Jerry William Gilbert, Coy, Gilbert & Gilbert, Richmond, KY, for appellees.

Opinion of the Court by Justice VENTERS.

Appellant, Reubin Bailey, appeals from an opinion of the Court of Appeals affirming a summary judgment entered by the Madison Circuit Court that enjoined him from blocking a discontinued county road with a gate. Appellant argues that we should reverse the Court of Appeals because: 1) Appellees, Curtis Tate and an association known as Preserve Rural Roads of Madison County, Inc. (hereinafter "Rural Roads"), have no standing to file suit against him; 2) the discontinuation of county maintenance on the road by the Madison Fiscal Court terminated any pub-

lic easement across his property; and 3) the Madison Circuit Court and the Court of Appeals rulings against him constitute an unlawful taking of his property and violate his constitutional rights. For the reasons set forth below, we affirm the Court of Appeals.

## I. FACTS AND BACKGROUND INFORMATION

On August 23, 2005, the Madison Fiscal Court voted to discontinue maintenance on the county road known as Dunbar Branch Road pursuant to KRS 178.070 due to high maintenance costs. Appellant owns property and lives on Dunbar Branch Road. About the time that the fiscal court voted to discontinue its maintenance of Dunbar Branch Road, Appellant erected a locked gate blocking the road at its intersection with Doylesville Road, and he provided a key to each property owner on the road.[1]

Appellees want to keep the road open and unobstructed. They filed suit against the Madison Fiscal Court to challenge its decision to discontinue maintenance on Dunbar Branch Road as inconsistent with KRS Chapter 178, and against Appellant to force him to remove the gates. Appellees consist of an individual resident of Madison County, Curtis Tate, who does not live or own property along Dunbar Branch Road, and a non-profit organization, Rural Roads, which consists of various Madison County residents, including Tate, who serves as director. Rural Roads claims only one member, Ida Wall, that owns property exclusively accessed by Dunbar Branch Road. Wall did not testify, provide an affidavit in this matter, or otherwise appear in this action. Affidavits from Rural Roads members, filed in sup-

---

1. Appellant had also repaired three gates placed across the road by others at different locations.

port of summary judgment, stated that they want Dunbar Branch Road to remain open because it provides them a shortcut to other destinations and it provides access to several sites on Dunbar Branch Road that are important to their families' history.

All parties moved for summary judgment. The Circuit Court granted summary judgment to the Madison Fiscal Court, finding that it "properly and legally utilized and [followed] the procedures set forth in KRS 178.070" to discontinue maintenance of Dunbar Branch Road. Thus, the suit against the Madison Fiscal Court was dismissed. No appeal was taken from the judgment dismissing the claim against the fiscal court, and the county is not a party to this appeal.

In a subsequent order, the Circuit Court granted Appellees' motion for summary judgment and denied Appellant's motion for summary judgment. The Circuit Court found that "Dunbar Branch Road is a county road that traverses through land owned by [Appellant]. [Appellant] has erected gates across the road and has maintained them since." The court also found that "KRS 178.116 provides for the initiation of formal proceedings for the reversion to adjoining land owners of a roadway formerly maintained by the county . . . as no such proceeding has been initiated, [Appellant] is without legal right or ownership to prohibit others from using the county road." Finally, the court ordered that "[Appellant] shall forthwith remove any obstruction or barrier placed or maintained by him on or across Dunbar Branch Road and is permanently enjoined from any action that restricts or impedes access of others to or over [Dunbar Branch Road]."

On direct appeal, the Court of Appeals affirmed the trial court's finding that Appellees had standing and that no unlawful taking occurred. The Court of Appeals found that *Warren County Citizens for Managed Growth, Inc. v. Bd. Of Comm'rs of Bowling Green*, 207 S.W.3d 7, 13 (Ky. App.2006) conferred standing upon Appellees since they were aggrieved by the obstruction of Dunbar Branch Road. Appellant filed for discretionary review with this Court and we granted his motion.

"Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky.App.2001). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary judgment should not be granted unless it appears to be impossible[2] for the non-movant to prevail at trial. *Id.* at 483.

## II. RURAL ROADS HAS ASSOCIATIONAL STANDING TO SUE APPELLANT FOR INJUNCTIVE RELIEF

Appellant first argues that Tate and Rural Roads have no cause of action against

---

**2.** On motion for summary judgment, "the movant should not succeed unless a right to judgment is shown with such clarity that there is no room left for controversy, and it is

established that the adverse party cannot prevail under any circumstance." *City of Florence v. Chipman*, 38 S.W.3d 387 (Ky.2001)

him because they lack standing. Appellant asserts that only landowners and residents whose only access to their property is Dunbar Branch Road have standing to complain about the gates, and therefore Tate lacks standing. Appellant also argues that Rural Roads lacks standing because it has failed to conclusively prove that any of its members own property along Dunbar Branch Road.

## A. Curtis Tate's Standing

To have standing to sue, one must have a judicially cognizable interest in the subject matter of the suit. "The interest may not be 'remote and speculative,' but must be a present and substantial interest in the subject matter." *City of Louisville v. Stock Yards Bank & Trust Co.*, 843 S.W.2d 327, 328–329 (Ky.1992) (quoting *HealthAmerica Corporation of Kentucky v. Humana Health Plan, Inc.*, 697 S.W.2d 946 (Ky.1985)). The determination of a party's standing requires consideration of the facts of each individual case. *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 202 (Ky.1989).

Tate admits that he neither owns, leases, nor resides on any property which is accessed by Dunbar Branch Road. Instead, he argues that he has standing because the road meets a public need, provides a short-cut for him, and gives him access to many sites important to his family history. In his deposition Tate stated that Dunbar Branch Road should remain open:

> not only for my own personal use [since] my parents and grandparents were raised up and down that road, that my family cannot go back to see the bridges that [their ancestors] built and have

their name on, but also for work. There's a lot of times that if you're working in Doylesville and you need to go to Red House, you can go through that way and cut across and save ten miles ... we've got farms that we rent [and] ... it's easier for us to cut through [Dunbar Branch to] go to another farm.

While having Dunbar Branch Road open to the public might be a convenience for Tate and others, their wishes for access to ancestral sites and a convenient short-cut do not constitute the "present and substantial interest" required for standing.[3]

This matter is analogous to the facts of *Kemper v. Cooke*, 576 S.W.2d 263 (Ky.App. 1979), wherein Kemper sought a mandatory injunction against a group of homeowners who blocked their street to prevent it from becoming a shortcut between two major roads. The street in question was a public way, but was not incorporated into the county road system. Kemper sought the injunction to force the removal of the obstruction, arguing that he had standing because the blocking of the street forced him to take a circuitous route to his church, which added approximately one mile to his trip. The court held that:

> [i]n order for Kemper to have standing, he must be able to show that the damages he suffered because of the obstruction were different from those suffered by the public as a whole. The difference must not only be in degree, but also in kind. *Husband v. Cotton*, 171 Ky. 177, 188 S.W. 380 (1916). Kemper contends that *Husband* should apply in his favor, because his injury is no different from an injury suffered by others who have to

---

3. We hasten to note one important exception: the grave of a relative. *See Commonwealth, Dept. of Fish & Wildlife Resources v. Garner*, 896 S.W.2d 10, 12–13 (Ky.1995) ("This Court recognizes the unquestioned right of Garner to visit the grave of a relative. *See* 14 Am. Jur.2d 697 § 36 Cemeteries. Under Kentucky law, the right of a relative to visit the graves of deceased relatives has been classified as an easement. *Haas v. Gahlinger*, Ky., 248 S.W.2d 349 (1952)."). Appellees do not claim this right.

take a more circuitous route to their own property. The facts in *Husband* are distinguishable from those in this case, however. In *Husband* the plaintiff's injury was the obstruction of ingress and egress from his own property. The injury was special and peculiar to that property owner. Kemper does not own any property abutting the obstructed street, and his ingress and egress from his own property is not affected. He has access to his church....

*Kemper*, 576 S.W.2d at 266. The court concluded that "in order to force a removal of the obstruction, [plaintiff] will need the cooperation of either an abutting property owner or the county fiscal court." *Id.*

Like Kemper, Tate argues that Appellant's blocking of Dunbar Branch Road forces him to take a longer route when he travels between certain locations. Yet, Tate does not and cannot argue that the blocking of Dunbar Branch Road has obstructed his access to his own property. He still has "reasonable access" to the county road system despite the potentially longer route he must take to certain locations. *See Commonwealth, Dept. of Highways v. Jackson*, 302 S.W.2d 373, 375 (Ky. 1957) (holding that the blockage of a county road at one end did not deprive owners of land abutting on county road of "reasonable access" from their land to public highway system, and owners were not entitled to damages even though the closing required that they take a slightly longer route to go to nearby town). Additionally, while the closure of Dunbar Branch Road may prevent Tate from visiting sites connected with his family's heritage and history, he personally possesses no easement or right to have access to those locations. Therefore, Tate has failed to show that he has a specific injury different than any other member of the public and he does not possess standing to individually bring suit against Appellant.

## B. Preserve Rural Roads of Madison County, Inc.'s Standing

We now turn to the question of whether Rural Roads has standing to sue Appellant under the theory of associational standing. The United States Supreme Court has identified three requirements that an association must meet to sue on behalf of its members:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Com. ex rel. Brown v. Interactive Media Entertainment and Gaming Ass'n, Inc.*, 306 S.W.3d 32, 38 (Ky.2010) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). While Kentucky has never officially adopted this entire test, we have held that, at a minimum, to establish associational standing at least one member of the association must individually have standing to sue in his or her own right. *Id.*

Appellant argues that Rural Roads does not have associational standing because it has not conclusively proven that any member of the group has individual standing. Appellant concedes that Ida Wall owns property on Dunbar Branch Road. Under *Kemper*, Wall's dependence upon the road for access to the land she owns gives her individual standing to sue for removal of Appellant's gate. 576 S.W.2d at 266. Rural Roads claims Wall as a member of its organization and that her individual standing supports its claim to associational standing. The question raised by Appellant is whether Rural Roads provided suf-

ficient evidence to prove that Wall is a member of their association.

 The entity claiming associational standing bears the burden of proving the requirements to assert standing. *Interactive Media Entertainment and Gaming Ass'n, Inc.,* 306 S.W.3d at 40 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). However, this burden of proof is no higher than the burden it must meet to prove any other elements of its case.

> On the contrary, it must simply be proven to the same extent as any other 'indispensable part of the plaintiffs case.' '[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.' At the pleading stage, less specificity is required. At that point, an association may speak generally of the injuries to 'some' of its members, for the 'presum[ption] [is] that general allegations embrace those specific facts that are necessary to support the claim.' By the summary judgment stage, however, more particulars regarding the association's membership must be introduced or referenced. Finally, before a favorable judgment can be attained, the association's general allegations of injury must clarify into 'concrete' proof that 'one or more of its members' has been injured. 'By refus[ing] to come forward with any such showing,' any claim to associational standing, and the potential for success on the merits is forfeited.

*Id.* at 39–40 (internal citations omitted).

The record includes the following evidence that Wall is a member of Rural Roads: Tate testified during his deposition that Wall was a member and contributed to Rural Roads; Wall is listed on a typewritten Rural Roads membership roster; and a personal check from Wall which was purportedly her donation to Rural Roads.[4] While far from overwhelming, that is evidence from which one can reasonably conclude that Wall is a member of the association. Rural Roads presented minimal, but nonetheless sufficient evidence to establish associational standing and to shift to Appellant the burden of going forward with proof to the contrary. Appellant came forth with no evidence to refute Rural Roads's evidence of associational standing. As the dissent notes, there may be sound reasons to adopt a rule of law that puts a greater burden upon the proponent of associational standing to establish its standing claim with more substantial evidence, but at the time this case was heard in the trial court, Rural Roads presented evidence meeting the applicable standard. Presumably, if evidence existed to prove otherwise, Appellant would have presented it.

Further, we find that Rural Roads satisfies the other two elements of the associational standing test as presented in *Interactive Media Entertainment and Gaming Ass'n, Inc.* According to Tate's deposition, Rural Roads was created because the members "don't want the roads closed. We want to be able to—Madison County citizens or the public needs to be able to go through from one part of the county to the other." This lawsuit, to keep Dunbar Branch Road open, is clearly germane to the organization's stated purpose. Also, there is no compelling reason as to why

---

4. We note that the check was made out to Ida Wall's relative Dorothy Wall, who is listed on the membership roster as a member of Rural Roads. The memo line of the check includes the phrase "Preserve Our Roads Committee."

Rural Roads cannot bring this suit on behalf of Wall and its other members. We conclude that with Wall's membership, Rural Roads has associational standing to assert its claim against Appellant. *Steelvest*, 807 S.W.2d at 480. Accordingly, we affirm the Court of Appeals' conclusion that Rural Roads has associational standing in this matter.

As a final note, the Court of Appeals opinion held that both Tate *and* Rural Roads had standing, using the rationale expressed in *Warren County Citizens*, 207 S.W.3d 7. However, *Warren County Citizens* addresses the requirements for a private association's standing to sue the government over a discretionary act, and not the standing for a private association to sue a private citizen. See *id.* at 13 (holding that a community action group had standing to sue the City of Bowling Green over a zoning change because one of the members of the group lived in close enough proximity to the re-zoned land to be impacted by the change). While the rationale of *Warren County Citizens* supports Rural Roads' standing to sue the Madison Fiscal Court over its decision to discontinue maintenance on Dunbar Branch Road, it is inapplicable to the lawsuit against Appellant, who is a private citizen, not a governmental entity.

## III. THE DISCONTINUANCE OF MAINTENANCE ON DUNBAR BRANCH ROAD PER KRS 178.070 DID NOT AFFECT ANY PUBLIC EASEMENT RIGHTS

 Concluding that Rural Roads has associational standing to maintain its lawsuit against Appellant, we now review his next allegation of error—that the Madison Fiscal Court's discontinuance of maintenance of Dunbar Branch Road, per KRS 178.070, terminated the public's easement to use Dunbar Branch Road. Appellant argues that once the fiscal court discontinued maintenance pursuant to KRS 178.070,[5] the public easement over Dunbar Branch Road was extinguished, and the land under the roadbed "returned" to the original landowners. Central to Appellant's argument, is the fact that the record contains no evidence of whether Madison County ever acquired title to the Dunbar Branch roadbed in fee (by condemnation, for example) or whether the county held only an easement. Appellant's argument can be summarized by this quote taken from *Waller v. Syck*, 146 Ky. 181, 142 S.W. 229, 231 (1912):

> As to whether the ground occupied by the old road was owned by the county or by appellants the record does not show. But in the absence of any showing to the contrary, we will presume that the county only acquired an easement over the ground occupied by [an] old road for use by the public [when it became a county road]; and, this being so, when its use was abandoned [or discontinued] by the county the ground occupied by the road reverted to the appellants, who own the land on both sides of it and over which it runs. It is very well settled that, when land is taken for a highway, the owner is entitled to the land, subject to its use by the public; and, when it ceases to be used by the public, the right of the owner to it becomes fixed. In other

5. KRS 178.070 states: "The fiscal court may direct any county road to be discontinued. Notice must be published, according to the provisions of KRS 178.050, and in addition notices must be placed at three (3) public places in vicinity of the road. After the posting of notices as aforesaid, the fiscal court shall appoint two (2) viewers who, together with the county road engineer, shall view the road and report in writing at the hearing what inconvenience would result from the discontinuance. Upon such report and other evidences, if any, the court may discontinue the road."

words, the abandonment of the use invests the owner of the land with the right to the possession, which he had surrendered for the public use.

*Waller,* however, is a statement of the common law regarding what happens when a county discontinues a road. In 1980, the General Assembly enacted KRS 178.116, and modified the common law. It states:

1) Any county road, or road formerly maintained by the county or state, shall be deemed discontinued and possession shall revert to the owner or owners of the tract of land to which it originally belonged unless at least one (1) of the following conditions exists:

(a) A public need is served by the road;

(b) The road provides a necessary access for a private person;

(c) The road has been maintained and policed by the county or state within a three (3) year period.

2) If the only condition which exists is for a necessary access for a private person, by a joint petition of all parties entitled to such access, the road shall be deemed discontinued and possession shall revert to the owner or owners of the tract of land to which it originally belonged.

3) If the only condition which exists is for a necessary access for a private person, by joint petition of all parties entitled to such access, the road shall be closed to public use but remain open in accordance with its condition and use for the access of the private parties involved.

4) If a county road has been discontinued under the provisions of KRS 178.070, then by a joint petition of all private parties entitled to necessary access the road shall be closed to public use but remain open in accordance with its condition and use for the access of the private parties involved, or by joint petition of all parties entitled to necessary access the road shall revert to the owner or owners of the tract or tracts of land to which it originally belonged.

5) For the purposes of this chapter "necessary access" shall be construed to include access to any farm, tract of land, or dwelling, or to any portions of such farm, tract of land, or dwelling.

KRS 178.116 provides three scenarios for what happens after a county decides to discontinue maintenance on a road. Under the first scenario, if none of the circumstances in KRS 178.116(1) exist or the road was not discontinued pursuant to KRS 178.070, the roadbed automatically reverts to the original owners of the land or their predecessors. Under this scenario, no formal action is required by the landowners because the statute operates by law and not by fiscal court action. *See* Ky. OAG 84–358.

The second scenario provides that if one of the conditions listed in KRS 178.116(1) exists and that the road was not discontinued pursuant to KRS 178.070 the statutory intent is that the road in question ceases to be a county road, but continues to serve as an open "public road." *See Sarver v. Allen County,* 582 S.W.2d 40, 41 (Ky.1979) (stating that a public road is one which is generally used by the public "through processes of dedication or prescription over which the counties have no choice or control.") If the condition met in KRS 178.116(1) was that either "[a] public need is served by the road" or "[t]he road has been maintained and policed by the county or state within a three (3) year period" there appears to be no recourse for the property owners along the road to obtain reversion of ownership or eliminate the public easement. However, if the condition in KRS 178.116(1) that was met is that

the road "provides necessary access for a private person" to access their property, KRS 178.116 (2 & 3) gives those landowners (with the agreement of the private parties needing access) the opportunity to petition the Fiscal Court to either have the land revert back to the original owners or their successors, or remain open, but for their private use.

KRS 178.116(4) provides a third scenario. When a county road is discontinued under the provisions of KRS 178.070, all of the landowners along the road who use that road for "necessary access," may petition the fiscal court [6] to either keep the road open for their private use only, or have the land under the roadbed revert back to the original owners. Implicit in this subsection is that if the landowners do not file a petition in accordance with KRS 178.116(4), the road remains open as a public road. *See Sarver,* 582 S.W.2d at 41.

The third scenario, KRS 178.116(4) is clearly applicable here. The summary judgment holding that the Madison Fiscal Court properly discontinued maintenance of Dunbar Branch Road pursuant to KRS 178.070 was not appealed and has therefore become a final adjudication of that point. We must accept the finality of that decision and recognize that the road was discontinued as a county-maintained way, pursuant to KRS 178.070.

Purportedly a petition was filed by *some* of the property owners along Dunbar Branch Road to close the road.[7] However, the petition itself is not in the record, and we cannot presume its existence. Additionally, we know that one of the owners of

property along Dunbar Branch Road, Wall, does not support closing the roadway, and it is therefore unlikely that she signed such a petition. Thus, we must conclude that no petition satisfying the requirements of KRS 178.116(4) was ever filed and that Dunbar Branch Road as of this time must remain an open, public road.

## IV. THE PRIOR COURT RULINGS DO NOT CONSTITUTE AN UNLAWFUL TAKING OF APPELLANT'S LAND

■ Finally, Appellant argues that the Madison Circuit Court and Court of Appeals decisions in this case—holding that Dunbar Branch Road is a public road and that he cannot block the road with gates— is an uncompensated and prohibited taking. U.S. Const. amend. V; Ky. Const. § 13. He thus argues that their rulings give an unconstitutional interpretation to both KRS 178.070 and KRS 178.116. Crucial to his argument is the financial burden which Appellant believes he will shoulder to maintain Dunbar Branch Road so that he may access his property. He believes that the burden to maintain the road will devalue his property because future purchasers will shy away from that responsibility. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (holding that a government issued prohibition interfering with the economic development of one's property can constitute a taking requiring compensation by the government).

Appellant's argument here is based upon the idea that the maintenance will cost

---

**6.** While KRS 178.116 does not state where such a petition is to be filed, one may reasonably assume that it be presented to the fiscal court as the body that must act upon it.

**7.** Reference to a petition being filed by some of the property owners along Dunbar Branch

Road to close the road appears in the minutes of the Madison Fiscal Court's finding of fact meeting where they took public comments on their plan to discontinue maintenance on several county roads.

more if Dunbar Branch Road is open to the public than it would if the road is private, presumably because there will be less wear and tear to repair a private road. We understand, and are sympathetic with his concern. Many rural roads in Kentucky are especially inviting to off-road motorcyclists, four-wheelers, and other vehicles that substantially degrade their unprotected surfaces and create ruts that invite further erosion by rain. That kind of damage is expensive to repair and is, perhaps, one reason that the county government decided it could no longer afford the maintenance.

 Appellant does have a right to access to his property which cannot be taken by the government. In *Jackson*, 302 S.W.2d at 374, our predecessor court stated:

> it was made clear in *De–Rossette v. Jefferson County*, 288 Ky. 407, 156 S.W.2d 165, 168 [ (1941) ], that if the closing of the road will deprive the owner of 'reasonable access' to his land, or of reasonably 'convenient ingress and egress,' he is entitled to damages. Again, in *Wright v. Flood*, 304 Ky. 122, 200 S.W.2d 117, 119 [ (1947) ], wherein there is a thorough review of the previous cases, it was said, 'Undoubtedly, a property owner may prevent the closing of a county road which deprives him of his sole or principal means of ingress and egress.' ... [W]e think the *Wright* case is authority, as in the *DeRossette* case, for the proposition that the landowner along a county road has a property right of reasonable access to the public highway system.

Thus, the county could not act so as to deprive Appellant of all access to the public road system. However, we find no authority that would support the conclusion that the county's refusal to maintain a road in good repair is an unconstitutional infringement upon a landowner's right of access. *Id.* at 375 (stating that a landowner has no property rights in continued maintenance of county roads). We also find no authority that a landowner may protect his own right of access by impeding the right of others, even if their use contributes to the degradation of the roadway.

While Appellant and the other landowners along Dunbar Branch Road have no responsibility to maintain the roadway for the public's benefit, *Kemper*, 576 S.W.2d at 263, we recognize that they bear the burden of adequately maintaining the road as their own needs require. These are, in part, reasons for which local governments have been organized and empowered by our statutes. We can only hold, as our law requires, that the Dunbar Branch Road must remain an open public way. How to share the costs of keeping the road passable is a matter that must be addressed through their local government. The law as we see it affords no other relief.

In summary, there is no unconstitutional taking of property in this matter, and we find no constitutional infirmity in the applications of KRS 178.070 and KRS 178.116 presented in this case.

## V. CONCLUSION

Thus, for the reasons set forth above, the decision of the Court of Appeals is affirmed.

MINTON, C.J., ABRAMSON, and SCHRODER, JJ., concur.

NOBLE, J., dissents by separate opinion in which CUNNINGHAM and SCOTT, JJ., join.

NOBLE, J., Dissenting:

The majority recognizes that the standing of Preserve Rural Roads of Madison

County, Inc. ("Rural Roads") depends solely on the standing of its member Ida Wall. If she does not have individual standing or if Rural Roads cannot adequately represent her interests, Rural Roads does not have standing in this case. I dissent because I would find that Rural Roads cannot base its associational standing on Wall, at least as the record presently stands.

My problem with relying on Wall as the basis for Rural Roads' associational standing is that we do not have enough information about Wall's interests to tell whether Rural Roads can adequately represent them. Wall did not testify, provide an affidavit, or otherwise participate in this case. Under the majority's opinion, Rural Roads is able to claim Wall as a member, assert that her interests are the same as Rural Roads', and ask for relief based upon her interests—all without any involvement or comment from Wall.

For the reasons explained below, I would require an organization asserting associational standing to define its member's affected interests and to show that there is enough of a relationship between the member and the organization that the organization can adequately represent those interests. Unless this is done, the burden cannot shift to the opposing party; there is rather a failure of the proponent to make his case, and summary judgment is not appropriate. Otherwise, standing based upon "associational interest" will become the new battle cry of *any* kind of an association that wants to be a party to a specific suit, no matter how slight their nexus is with the "member." The majority view literally means that the Kentucky Retirement Systems, Humana Health Care, and Sam's Club could intercede in any lawsuit in which I might have an interest in which they shared—simply because I am a "member" of those organizations.

That is not what my membership in those organizations was intended to accomplish, and I certainly would not endorse every concept that might appeal to any one of them.

Bailey filed a motion for summary judgment based in part on Rural Roads' lack of standing. I would remand to the trial court to determine whether Ida Wall is a member of Rural Roads and whether she consents to be represented by the organization. Even if the majority is correct that Rural Roads has provided evidence sufficient to show that Wall is a member, the organization has not provided any evidence that she wants Rural Roads to represent her interests in the litigation. Therefore, in my view, summary judgment is not appropriate.

## A. Background on Associational Standing

In order to have standing in a case, a party must show that it has "a judicially recognizable interest in the subject matter of the suit." *HealthAmerica Corp. of Kentucky v. Humana Health Plan, Inc.*, 697 S.W.2d 946, 947 (Ky.1985). The purpose of requiring standing is to make sure that the party litigating the case has a "personal stake in the outcome of the controversy" such that he or she will litigate vigorously and effectively for the *personal* issues. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Requiring a party to demonstrate a personal interest in the case helps to ensure that, by the time a court has to make a decision, the issues and facts have been fully developed. *Id.* Furthermore, the requirement of standing prevents courts from being presented with hypothetical or abstract questions. *Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

The doctrine of *associational* standing recognizes that sometimes organizations will be able to litigate the interests of their

members as well as or better than the members would on their own when the interests of the organization and its members are indeed the same. In *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock (UAW)*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Supreme Court identified the reasons for recognizing associational standing: "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." *Id.* at 289, 106 S.Ct. 2523 (quoting Note, *From Net to Sword: Organizational Representatives Litigating Their Members' Claims*, 1974 U. Ill. L. Forum 663, 669).

This Court has allowed associational standing in the past, *e.g.*, *City of Ashland v. Ashland F.O.P. No. 3, Inc.*, 888 S.W.2d 667 (Ky.1994), but it has only recently begun outlining the requirements and limits of the doctrine, *see Commonwealth ex rel. Brown v. Interactive Media Entertainment and Gaming Ass'n, Inc. (iMEGA I)*, 306 S.W.3d 32 (Ky.2010); *Interactive Media Entertainment and Gaming Ass'n, Inc. v. Wingate (iMEGA II)*, 320 S.W.3d 692 (Ky.2010). Because there are few Kentucky cases on associational standing, this dissent turns to federal cases for guidance.

In defining the limits of associational standing, the federal courts have focused on the underlying goal of standing: to ensure "concrete adverseness" so that cases are vigorously litigated and clearly presented to the courts. *Baker*, 369 U.S. at 204, 82 S.Ct. 691. The Supreme Court in *UAW* discussed how the structure of organizations will often guarantee zealous advocacy:

> [T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. . . . The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests.

477 U.S. at 290, 106 S.Ct. 2523. Given this concern that the association adequately represent its members' interests, organizations like unions and trade associations, which have clearly defined membership and leadership structures, have generally had an easier time showing associational standing in the federal courts. *See* Kelsey McCowan Heilman, Comment, *The Rights of Others: Protection and Advocacy Organizations' Associational Standing to Sue*, 157 U. Pa. L.Rev. 237, 239 (2008).

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), provided the foundational three-part test for associational standing:

> Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. 2434. Kentucky has not adopted this entire test, but this Court has held that "at least the first requirement must apply." *iMEGA I*, 306 S.W.3d at 38. "An association can have standing only if its members could have sued in their own right." *Id.* This case is the next opportunity to clearly define the law of associational standing in Kentucky, and we must take care to clearly advance when and how it applies.

In *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme Court addressed the claim of an advocacy organization, which is the type of organization this case is about. The Supreme Court rejected a claim that a conservation organization could have standing based on its own longstanding goal of conserving natural lands. *Id.* at 738–40, 92 S.Ct. 1361. Although the Sierra Club had tens of thousands of members, some of whom may have had a personal interest in the affected lands, it had not provided any information or evidence about the personal interests of its members. *Id.* at 735 & n. 8, 92 S.Ct. 1361. The Sierra Club and other advocacy organizations (like Rural Roads) differ from unions and trade associations because unions and trade associations are organized for the purpose of protecting and promoting their members' *personal* interests. Advocacy organizations like the Sierra Club, in contrast, aim to protect a wider set of interests such as the public's interest in preserving natural areas for public use, or even a general interest in preserving wild areas even if no one ever goes to visit them. *Cf.* Karl S. Coplan, *Is Voting Necessary? Organizational Standing and Non–Voting Members of Environmental Advocacy Organizations*, 14 Southeastern Envtl. L.J. 47 (2005) (describing the trend toward "mission-driven" advocacy organizations).

To address the uncertainty about the plaintiff's stake in the litigation, the Supreme Court in *Morton* said that the organization would have to show that one or more of its members had suffered a personal injury. 405 U.S. at 738, 92 S.Ct. 1361. This requirement "serve[s] as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." *Id.* at 740, 92 S.Ct. 1361.

*Morton* seems to be directly on point with the present facts. Rural Roads does not have the singular goal of preserving landowners' access to roads; its goal is to preserve all rural roads in the county for public use. Therefore, we should consider what the individual member's interest is and whether the organization can adequately represent that interest. This gives rise to two specific questions relevant to this case: What must an association do to show who is a member? What must an association do to show that its member would have standing to sue individually?

**B. Who Is a "Member" for Associational Standing Purposes?**

The U.S. Supreme Court has never defined the requirements for "membership," Heilman, 157 U. Pa. L.Rev. at 251, and the lower federal courts have reached varying conclusions on how to define it. At least one court has allowed the organization to define its own membership. *Friends of the Earth, Inc. v. Chevron Chemical Co.*, 129 F.3d 826 (5th Cir.1997). In *Friends of the Earth*, an environmental organization considered everyone who had made a contribution to the organization, or who had a contribution made in their honor, to be a member. *Id.* at 827. The court held that the organization could assert standing on behalf of its members despite its loose requirements for membership because the members voluntarily associated themselves with the organization, elected the governing body of the organization, and financed its activities. *Id.* at 829. Importantly, the court noted that the individuals who were claimed as members for the purposes of litigation *testified* in court that they were in fact members of the organization. *Id.* Thus there was evidence that the members wanted the organization to represent their interests in the case.

At least a few cases have held that members must indicate their consent to have the organization represent their interests. In *Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency*, 507 F.2d 905 (9th Cir. 1974), an environmental organization asserted standing to challenge an Arizona state action on behalf of its 107 members who lived in the state. *Id.* at 910. It did not name the members, submit affidavits from them, or have them participate in any way. *Id.* The court noted that there had been "no allegation or showing on the record in this court that the Arizona members have either requested to be represented or consented to be represented by the NRDC in this action." *Id.* The court dismissed the NRDC's claim because the organization had not made the required showing under *Morton. Id.* Other courts have reached similar conclusions. *See Local 194, Retail, Wholesale and Dep't Store Union v. Standard Brands, Inc. (Local 194)*, 540 F.2d 864, 867–68 (7th Cir.1976) (requiring a union seeking associational standing to "give notice of its representation to all its members" and creating a way for members who chose not to be represented by the union to opt out); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 344 n. 16 (C.D.Cal. 1997) (noting, in dicta, that "an organization only has associational standing when it has a clear mandate from its membership to take the position asserted in the litigation").

I favor the view that the member must consent in writing or by testimony to the association's representational standing on the member's behalf, as a matter of Kentucky law on associational standing. Without some indication that the member wants the organization to assert his or her interests, there is little guarantee that the organization can adequately represent them.

## C. What Must an Association Do to Show that its Member Would Have Standing to Sue Individually?

In order to get associational standing, an organization must show that it has at least one member who would have standing to sue individually. *UAW*, 477 U.S. at 281–82, 106 S.Ct. 2523. To meet this requirement, the organization will usually have to identify the member and establish that member's interest in the litigation. *iMEGA I*, 306 S.W.3d at 38–39. I would add that the member must consent to have the organization represent her interests, unless *every* member of the organization shares the same interest and injury, as discussed below. With those safeguards, there is less likelihood of some hapless member finding himself as the poster child for an issue he may not truly be ready for.

In *iMEGA I*, this Court considered the standing of gaming associations that claimed to represent a number of unnamed registrants of gaming websites. The Court held that each gaming association had to identify at least one member who had suffered an injury in order to establish standing. *Id.* at 39.

In *iMEGA I*, the Court recognized that in some situations naming a specific member who had suffered a specific injury would not be necessary. The Court cited *City of Ashland v. Ashland F.O.P. No. 3*, 888 S.W.2d 667 (Ky.1994), for this contention. In that case, this Court held that an organization "had sufficient standing because the nature of police work was such that the lodge members had a real and substantial interest in [the dispute]." *Ashland F.O.P.*, 888 S.W.2d at 668. In *Ashland F.O.P.*, it was stipulated that the organization represented the majority of the police officers in the city, but the organization apparently did not provide a membership list. *Id.* This Court distin-

guished *Ashland F.O.P.* from the organizations in *iMEGA I* because the membership of the F.O.P. was stipulated—the organization represented the majority of officers in the city—and all of the officers who belonged to the organization would be affected by the ordinance that was being challenged. *iMEGA I*, 306 S.W.3d at 39 (citing *Ashland F.O.P.*, 888 S.W.2d at 668). The injury would be suffered by all the members in the same way. *Id.* In *iMEGA I*, in contrast, it was not clear who the members were or which members would be injured by the challenged action. *Id.* The Court noted, "In cases where the harm is specific, the proof of standing must be equally specific." *Id.*

This case is more similar to *iMEGA I* than *Ashland F.O.P.* The potentially redressable harm is more specific than the organization-wide harm in *Ashland F.O.P.* To show associational standing, then, Rural Roads must first identify a member and show that the member consents to have her interests represented by the organization. Then the organization must show that the member has a judicially recognizable interest such that she would have standing to bring the case individually. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

This individual member's standing must be proved to the same extent that other facts must be proved at each successive stage of the litigation. The association bears the burden of showing that the member has standing. *iMEGA I*, 306 S.W.3d at 38 (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130). At the pleading stage, general allegations will suffice; by the summary judgment stage, "more particulars regarding the association's membership must be introduced or referenced"; and in order to get a favorable judgment, the association must establish concrete evidence that at least one of its members who

consents to be represented by the organization has been injured, or under our law, that *all* members have been injured sufficient to constitute standing to all. *Id.* at 40 (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, and *Sierra Club v. SCM Corp.*, 747 F.2d 99, 107 (2d Cir.1984)); *Ashland F.O.P.*, 888 S.W.2d at 668. In other words, the ordinary Rules of Civil Procedure apply to standing just as they apply to any other "indispensable part of the plaintiffs case." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

## D. Analysis of this Case

I would find that Rural Roads has not established its standing because it has not shown that Ida Wall consented to Rural Roads' representation in writing or by testimony.

As the majority points out, Rural Roads has provided some evidence that Wall is a member of the organization. Curtis Tate, one of the directors of the corporation, testified that Wall was a member; her name was on a typed membership list for the corporation; and Wall made out a check to her relative Dorothy Wall noting "Preserve Our Roads Committee" on the memo line. So there is at least some evidence that she was a member of the organization and agreed with its goals.

There is no evidence, however, that Wall has consented to have her interests represented by Rural Roads or that she even knows that the organization is asserting her interests. Several other courts have found that an organization's failure to get the consent of the members it claims to represent is problematic for associational standing, and so should we. *See Nat'l Resources Defense Council*, 507 F.2d at 910; *Local 194*, 540 F.2d at 867–68; *Nat'l Coal. Gov't of Union of Burma*, 176 F.R.D. at 344 n. 16. Without some indication from Wall that she consents to Rural Roads asserting her interests, there is no guaran-

tee that her interests will be adequately represented.

Wall is the only member of Rural Roads who has even a potential claim for standing because she is the only member who owns land on Dunbar Branch Road. The other members of the organization have only generalized injuries; their claimed injuries of being forced to take a longer route across the county and of being unable to visit historic sites are no different from the injuries suffered by other members of the general public. Wall's harm is specific to her because of her ownership of land, and "[i]n cases where the harm is specific, the proof of standing must be equally specific." *iMEGA I*, 306 S.W.3d at 39.

If Wall, in fact, objects to having the gates across the road, then her ownership of land on the road gives her standing to sue. The inconvenience caused by the gates would be "injury" enough to establish standing. But it is not obvious, without some input from Wall, that she would object to the gates. Every other landowner along the road apparently wanted the gates to remain in place. Bailey testified in his deposition that he provided Wall with a key to the gates; specifically, he gave Gary Owens, who was "acting for Ida Wall," a key to the gates with instructions to make copies. If Wall and her family had access to their land through the gates, it is not obvious that she would want the gates taken down. In fact, Wall may be benefitted rather than injured by Bailey's actions. Bailey's reason for putting up the gate was to minimize the wear and tear on the road caused by public use of the road, and thereby to minimize the costs of repair which would be borne by landowners along the road—including, presumably, Wall.

Without any indication of Wall's consent, there is no way for a court to know whether the controversy is purely hypothetical because there is no real disagreement between Wall and Bailey or, stated differently, whether Rural Roads is actually litigating *against* the interests of the person it claims to represent.

I would require a showing that Wall consents to have Rural Roads represent those interests. Proof that she is a member is not, by itself, sufficient to show that she has consented to the representation. Probably the easiest way for an organization to do this at the summary judgment stage is to have the member sign an affidavit stating that she is a member of the organization and she consents to having her interests represented by the organization, and explaining how she is injured by the defendant's actions. An affidavit is enough to avoid summary judgment. *See* CR 56.05. The organization may also choose to present the information in a deposition or other form of discovery.

This requirement would not put a large burden on plaintiff-organizations, but it would help to ensure that organizations can adequately represent their members' interests. And it would serve the underlying goal of associational standing—ensuring vigorous litigation of members' interests—because it would define the individual member's interests in the case and confirm that the member wants those interests to be litigated by the organization.

Consequently, I would remand this case to the trial court for further development of the proof that Rural Roads has associational standing. Summary judgment was premature.

CUNNINGHAM and SCOTT, JJ., join.