**INTERACTIVE GAMING COUNCIL, Appellant**

v.

**COMMONWEALTH of Kentucky, ex rel., J. Michael BROWN, Secretary Justice and Public Safety Cabinet, Appellee.**

No. 2011–CA–001859–MR.

Court of Appeals of Kentucky.

Feb. 21, 2014.

John L. Tate, Louisville, KY, for appellant.

Ian T. Ramsey, Bethany A. Breetz, Chadwick A. McTighe, Louisville, KY, A. Jeff Ifrah, Washington, D.C., for appellant.

D. Eric Lycan, William H. May, III, William C. Hurt, Jr., Lexington, KY, for appellee.

Before ACREE, Chief Judge; JONES and MAZE, Judges.

*OPINION*

JONES, Judge:

The Appellee, the Commonwealth of Kentucky ex rel., J. Michael Brown, Secretary of the Justice and Public Safety Cabinet (the Commonwealth), initiated this action in Franklin Circuit Court seeking forfeiture of 141 internet domain names it claimed were used illegally for gambling in the Commonwealth. The Appellant, Interactive Gaming Counsel (IGC), a trade association comprised of various entities involved in the internet gaming industry, moved the Franklin Circuit Court to allow it to intervene on behalf of the owners of the domain names. On September 12, 2011, the Franklin Circuit Court denied IGC's motion after concluding that IGC had failed to satisfy all the prerequisites for associational standing. IGC now appeals from the September 12, 2011, order. For the reasons more fully explained below, we reverse.

## I. Procedural & Factual Background

This case has a long, complex, and somewhat tortured procedural history. For the purpose of brevity, we recount only the facts and procedural history most relevant to understanding and appropriately analyzing the narrow associational standing issue before us.

On August 26, 2008, the Commonwealth filed an *in rem* civil action in the Franklin Circuit Court seeking forfeiture to the Commonwealth of 141 internet domain names it alleged were illegal gambling devices, and therefore subject to forfeiture pursuant to KRS[1] 528.100 and KRS 500.090. On the Commonwealth's motions, the trial court sealed the case, conducted an *ex parte* hearing, and issued a seizure order for the domain names. The trial court then unsealed the case.

After allegedly learning of the seizures from media accounts, IGC moved the trial court to allow it to intervene in the forfeiture action so that it could contest the forfeitures on behalf of its members, some of whom allegedly claimed an ownership interest in a portion of the seized domain names. Specifically, IGC requested intervention so that it could assert with respect to the entire forfeiture that: (1) the trial court lacked jurisdiction; (2) domain names are not "property" subject to forfeiture; (3) the domain names do not constitute a "gambling device or gambling record" as required by KRS Chapter 528; and (4) poker is not gambling under KRS Chapter 528. In addition to contesting IGC's arguments on the merits, the Commonwealth countered that IGC did not have standing to intervene in the civil forfeiture action.

The trial court conditionally granted IGC's motion to intervene for the purpose of allowing the parties to file briefs on the issues that IGC raised as well as on the issue of IGC's standing to intervene in the forfeiture action. In an October 16, 2008, opinion and order, the trial court found that it had subject matter jurisdiction over the civil forfeiture action and *in rem* jurisdiction over the 141 domain names, which the trial court classified as property subject to seizure and forfeiture as "gambling devices." The trial court then retroactively denied IGC's motion to intervene on the basis that IGC had not demonstrated that it was an indispensable party.

IGC, among other entities, then sought a writ of prohibition from this Court. IGC asked us to enter a writ prohibiting the trial court from proceeding with the forfeiture. *Interactive Media Entm't and Gaming Ass'n, Inc. v. Wingate*, No. 2008–CA–2036–OA, 2009 WL 142995 (Ky.App. Jan. 20, 2009), *rev'd Com. ex rel. Brown v. Interactive Media Entm't and Gaming Ass'n, Inc.*, 306 S.W.3d 32 (Ky.2010) (hereinafter *iMega I* ). After reviewing the matter, a panel of this Court concluded that the internet domain names were not "gambling devices" within the statutory definition of KRS 528.010(4).[2] *Id.* As such, this Court concluded that the trial court lacked jurisdiction to conduct a forfeiture of the domain names and entered an order prohibiting the trial court from enforcing its order seizing the 141 domain names and from conducting a scheduled forfeiture hearing.[3] *Id.*

1. Kentucky Revised Statutes

2. Judge Taylor issued a concurring opinion that further observed that there could be no civil forfeiture without a criminal conviction establishing that the domain names were sub-

ject to forfeiture. *Id.* at *4 (Taylor, J., concurring).

3. In entertaining the writ petition, we cursorily addressed the standing issue:

Although the trial court concluded in its October 16th order that the associations

The Commonwealth appealed our ruling to the Kentucky Supreme Court. *iMega I*, 306 S.W.3d at 34–35. The Supreme Court noted that many compelling arguments had been put before it for affirming the writ. *Id.* at 35. However, it ultimately reversed and vacated our decision granting the writ on the basis that none of the parties before it had demonstrated standing to challenge the trial court. *Id.* at 36. Of relevance, the Supreme Court held that IGC could not demonstrate associational standing without at least putting forth some evidence to establish that its members included entities with an interest in the domain names at issue. *Id.* at 37–40. The Court then instructed the parties that the petition could be re-filed with the Court of Appeals, if a party with standing came forward. *Id.* at 40.

Thereafter, IGC filed a renewed motion with this Court supported by evidence allegedly establishing that its members included owners of the seized domain names. *Interactive Media Entm't and Gaming Ass'n, Inc. v. Wingate*, 320 S.W.3d 692 (Ky.2010) (hereinafter *iMega II* ). This Court recommended that the writ petition be transferred to the Kentucky Supreme Court. *Id.* The Kentucky Supreme Court accepted transfer and issued an opinion clarifying its prior opinion. *Id.* The Court clarified that the trial court was in the best position to determine whether IGC had established associational standing and the applicability of associational standing to this *in rem* proceeding. *Id.* at 696.

Thereafter, as directed, the parties returned to the trial court for a determination on the associational standing issue. The trial court issued an opinion and order on September 12, 2011, finding that IGC presented sufficient evidence that at least one of its members, Pocket Kings Ltd., is one of its members and is the owner of fulltiltpoker.com, one of the domain names at issue. The trial court further concluded that IGC's actions in this litigation are germane to its purpose. Nevertheless, the trial court concluded that IGC could not establish associational standing because civil forfeiture actions require the participation of individual property owners. It is from this order that IGC appeals.

## II. Standard of Review

Our review requires us to consider both the trial court's factual findings and legal conclusions. Different standards of review apply depending on whether we are reviewing findings of fact or conclusions of law.

■ The trial court's ultimate determination on the standing issue is a pure legal question. *Tax Ease Lien Inv. 1, LLC v. Commonwealth Bank & Trust*, 384 S.W.3d 141, 143 (Ky.2012). Therefore, our review of that issue is *de novo*. *Id.* Under *de novo* review, we owe no deference to the trial court's application of the law to the established facts. *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky.App.1998).

■ In this case, however, the trial court also made threshold factual determinations regarding IGC's membership and purpose. Those preliminary, factual determinations are entitled to deference. *Medley v. Bd. of Educ. of Shelby Cnty.*, 168 S.W.3d 398, 402 (Ky.App.2004). We cannot reverse factual findings that are supported by substantial evidence. *Id.* "Substantial evidence" is "evidence of sub-

had no standing to advance the interests of their members, the fact remains that they were initially granted leave to intervene to assert those very interests. Having participated in the proceedings below, and given

the adverse ruling on their claims of lack of jurisdiction, we find no basis for denying those same participants the right to seek relief in this proceeding.
*Id.* at *3.

stance and relevant consequence sufficient to induce conviction in the minds of reasonable people." *Abbott Lab. v. Smith,* 205 S.W.3d 249, 253 (Ky.App.2006).

### III. Analysis

The precise question before us is whether IGC established associational standing to allow it to advance its members' interests in this forfeiture action. The concept of associational standing is not well developed in Kentucky. While Kentucky has generally recognized associational standing, it has never officially adopted a precise test to determine whether an association has standing in a particular circumstance. *See Bailey v. Preserve Rural Roads of Madison Cnty., Inc.,* 394 S.W.3d 350, 356 (Ky.2011) (citing *iMega I,* 306 S.W.3d at 38). Furthermore, it appears that whether an association can represent its members' interests in the context of a forfeiture action is also an issue of first impression for our courts.

### A. Standing in General

 Standing is a legal term defined as a "sufficient legal interest in an otherwise justiciable controversy to obtain some judicial decision in the controversy." *Kraus v. Kentucky State Senate,* 872 S.W.2d 433, 439 (Ky.1993). Standing and justiciability are separate, but interrelated concepts. Justiciability focuses on whether there is a live controversy for the court to decide. "Questions which may never arise or which are merely advisory, academic, hypothetical, incidental or remote, or which will not be decisive of a present controversy" do not present justiciable controversies. *Hughes v. Welch,* 664 S.W.2d 205, 208 (Ky.App.1984).

 Standing, a subset of justiciability, focuses on whether the parties before the court have a personal stake in the outcome of controversy. "In order to have standing to sue, a plaintiff need only have a real and substantial interest in the subject matter of the litigation, as opposed to a mere expectancy." *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 202 (Ky.1989). "The purpose of requiring standing is to make sure that the party litigating the case has a 'personal stake in the outcome of the controversy' such that he or she will litigate vigorously and effectively for the personal issues." *Bailey,* 394 S.W.3d at 362 (Noble, J. dissenting) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The determination of a party's standing requires consideration of the facts of each individual case. *Rose,* 790 S.W.2d at 202.

### B. Associational Standing as Developed in the Federal Courts

The concept of associational standing in the federal courts dates back to the late 1950s when the Supreme Court of the United States allowed the National Association for the Advancement of Colored Persons (NAACP) to defend a contempt order requiring it to produce its Alabama membership list by asserting that production of the list would violate its members' First Amendment rights. *See National Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Even though the individual members were not parties to the action, the Court determined that there was an adequate nexus between the NAACP and its members' interests to satisfy any standing concerns. *Id.* at 457–59, 78 S.Ct. 1163. The Court explained:

> The Association both urges that it is constitutionally entitled to resist official inquiry into its membership lists, and that it may assert, on behalf of its members, a right personal to them to be protected from compelled disclosure by

the State of their affiliation with the Association as revealed by the membership lists. We think that petitioner argues more appropriately the rights of its members, and that its nexus with them is sufficient to permit that it act as their representative before this Court. In so concluding, we reject respondent's argument that the Association lacks standing to assert here constitutional rights pertaining to the members, who are not of course parties to the litigation.

*Id.* at 458–59, 78 S.Ct. 1163.

Over the next several decades the federal courts expanded the concept of associational standing to allow associations to sue in court to vindicate the rights of their members, even in the absence of an actual injury to the association. The Court squarely recognized an organization's standing to bring such a suit for the first time in *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Two years later, in *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court articulated a three-prong associational standing test:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

The first two prongs of the *Hunt* test are grounded in Article III's case or controversy requirement. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 554–57, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (hereinafter *Brown* ). As such, they are viewed as constitutional standing prerequi-

sites. *Id.* The third prong is not constitutionally mandated; rather, it is prudential. *Id.* at 557, 116 S.Ct. 1529.

It is vitally important to distinguish between constitutional standing and prudential standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because federal courts are constitutionally prohibited from issuing advisory opinions, the first two prongs of *Hunt* are absolute prerequisites that every association seeking to litigate on behalf of its members must establish. *Brown,* 517 U.S. at 554–57, 116 S.Ct. 1529. Because the third prong is a rule of prudential standing, it is more "flexible". *See United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 2686, 186 L.Ed.2d 808 (2013) (quoting *Deposit Guaranty Nat. Bank, Jackson Miss. v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). This prudential third prong is "best seen as focusing on [ ] matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *Brown,* 517 U.S. at 557, 116 S.Ct. 1529.

## C. Associational Standing in Kentucky

"Kentucky has never officially adopted [the] entire [*Hunt* ] test." *Bailey,* 394 S.W.3d at 356. The Kentucky Supreme Court has simply cautioned that "at a minimum, to establish associational standing at least one member of the association must individually have standing to sue in his or her own right." *Id.* Our Supreme Court has not addressed the third-prong of the *Hunt* test, the prong that is at the heart of the issue before us.

As noted above, this third prong is not a constitutional requirement. *See Brown,* 517 U.S. at 555, 116 S.Ct. 1529. "[O]nce an association has satisfied *Hunt's* first and second prongs assuring adversarial vigor in pursuing a claim for which mem-

ber Article III standing exists, it is difficult to see a constitutional necessity for anything more." *Id.* at 556, 558, 116 S.Ct. 1529. Indeed, *Hunt's* third prong focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *Id.* at 555–57, 116 S.Ct. 1529.

The United States Supreme Court has identified the three central purposes of the third *Hunt* prong. The Court explained that the third prong (1) "may well promote adversarial intensity"; (2) "may guard against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity"; and (3) "may hedge against any risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed." *Id.* at 556–57, 116 S.Ct. 1529.

 While most of our sister states have adopted associational standing, there is some divergence between them on application of the third prong. *See International Union of Operating Engineers, Local 148, AFL–CIO v. Illinois Dept. of Employment Sec.,* 215 Ill.2d 37, 293 Ill. Dec. 606, 828 N.E.2d 1104, 1112 (2005) (collecting cases). After having reviewed federal law as well as many opinions from our sister state courts, we believe that the third *Hunt* factor should be applied flexibly in light of the nature of the claims and/or defenses actually at issue in the suit. Our courts should have a degree of flexibility in applying this prudential third prong so that they can achieve judicial economy while at the same time ensuring that claims are vigorously litigated by parties that have a real and substantial stake in the outcome of the litigation.

For this reason, we do not agree with the Commonwealth that the third prong should be applied rigidly to prohibit associational standing in all forfeiture actions. Our courts have always adhered to the principle that whether a party has standing in a particular case is an individualized, case-by-case determination. *Rose,* 790 S.W.2d at 202 ("The issue of standing is one which is to be decided on the facts of each case.").

Moreover, utilizing the third prong of *Hunt* to adopt the bright-line rule advanced by the Commonwealth would take away the very flexibility the third, prudential prong is designed to give courts. "[W]e see little sense in [adopting] an iron-clad rule that has the effect of denying relief to members of an association based upon an overly technical application of the standing rules." *International Ass'n of Firefighters, Local 1789 v. Spokane Airports,* 146 Wash.2d 207, 45 P.3d 186, 190 (2002). Instead, we believe that the third prong should be considered on a case-by-case basis so that the examining court can determine the nature of the rights the association seeks to redress in the *particular action* before it.

Certainly, there are cases where individual proof and relief are of such magnitude and so interwoven that it is impossible to see how an association could effectively or efficiently advocate on behalf of all the members. *See Bano v. Union Carbide Corp.,* 361 F.3d 696, 714 (2d Cir.2004) (denying standing because claims were for bodily injury and property damage requiring highly individualized damages assessments unique to each member). However, there are also cases where individualized rights are implicated, but not determinate, that are well-suited for associational standing because the pure legal questions predominate and relate to all potential claimants. *See International Union, United*

*Auto., Aerospace and Agr. Implement Workers of America v. Brock,* 477 U.S. 274, 288, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (holding that union could litigate case without participation of any member where only question was whether Secretary properly interpreted statutory provision and once the legal issue were resolved the amount of damages per union member could be left to state authorities).

We believe that this was the point the Ohio Court of Appeals was trying to make in *In re 730 Chickens,* 75 Ohio App.3d 476, 599 N.E.2d 828, 834 (1991), a case both parties cite extensively in their briefs. The majority in *730 Chickens* did not hold that associational standing would be proper in every civil forfeiture proceeding. Instead of announcing a bright-line, hard-and-fast rule, the majority chose to focus on the propriety of associational standing in the forfeiture action before it. The majority ultimately concluded that the association was challenging the forfeiture as a whole, not making arguments that would pertain to individual chicken owners differently. As such, the court held that associational standing was proper despite the fact that the case involved the forfeiture of chickens owned by various individuals.

> The dissent contends that OGBA (Ohio Gamefowl Breeder's Association) cannot satisfy the standing requirements ... since the individual participation of its members is required due to the nature of the claim and/or the relief being sought. However, this is not a case where the association seeks damages on behalf of various members whose injuries may vary in specific amounts, thus requiring their individual participation. Rather, the state seeks enforcement of the statutory forfeiture provisions of R.C. Chapter 2933 against all chickens in its possession. Appellants contest the authority of the trial court to order destruction under that statutory scheme

and complain of failure to comply with due process and statutory notice requirements. *The outcome of this case does not turn on factual matters that are unique to certain individual members of the association that would require their participation. The questions before the trial court and this body are essentially legal in nature, not factual.* Accordingly, individual participation was not required.

*Id.* at 834 (emphasis added).

 Like the federal Constitution, our state Constitution limits courts to deciding cases or controversies. *See* Ky. Const. § 112(5) ("The Circuit Court shall have original jurisdiction of all *justiciable* causes not vested in some other court.") (emphasis added). Thus, we conclude that the first two prongs of the *Hunt* test are constitutionally mandated and absolute prerequisites to establishing associational standing. We further conclude that while courts should apply the third prong of the *Hunt* test, they should do so on a case-by-case basis keeping in mind its prudential purposes of efficiency and fair representation. The fact that some individualized proof may be required should not automatically foreclose associational standing where the first two prongs have been satisfied and the case can be decided on broad legal determinations that are equally applicable to all members.

### D. Application

We first briefly address the Commonwealth's argument that the trial court incorrectly determined that IGC satisfied the first and second prongs of the *Hunt* test.

 With respect to the first prong, the trial court reviewed the evidence before it regarding the composition of IGC's membership. It determined that "IGC

submitted affidavits that undeniably prove that Pocket Kings Ltd. is a member of the organization and is the owner of fulltiltpoker.com, one of the domain names at issue." While the Commonwealth presented evidence allegedly refuting the affidavits, or at least calling their veracity into question, the affidavits nonetheless constitute substantial evidence. As such, we must defer to the trial court's factual determination that IGC's membership includes at least one entity that has an ownership interest in at least one of the domain names at issue.[4] Neither *Hunt* nor *Bailey* require anything more.

Likewise, the trial court had evidence before it regarding IGC's general purposes. The trial court apparently found this evidence satisfactory. We find nothing in the record that causes us to question the soundness of the trial court's factual determination on the second prong.

■ We now turn to the third prong. The Commonwealth asserts that pursuant to KRS 500.090 each lawful claimant (domain name owner) must come forward in this action and prove that for each domain it did not engage in illegal gambling in Kentucky, or that the domain was used as such without the knowledge and consent of the owner. Thus, the Commonwealth contends that the identity of the owner must be proved for each domain, along with specific and individualized proof that each claimant was an innocent owner making associational standing inappropriate for this action.

The Commonwealth's argument presupposes that there are no *prima facie* challenges to the forfeiture as a whole. Such is not the case here. IGC's arguments are directed toward the entire forfeiture procedure, not toward issues affecting the individual ownership interests of the varied domain name owners. If IGC prevails as a matter of law, then the claimants will not have to come forward and demonstrate any individualized proof. IGC's claims raise pure legal issues that by and large can be resolved with little, if any, need for individualized factual proof.

The alternative—forcing all 141 domain name owners to pursue their claims individually—would be burdensome and inefficient. The Supreme Court has acknowledged that associational standing confers certain advantages on individual members and the judicial system as a whole. Specifically, an association "can draw upon a pre-existing reservoir of expertise and capital" that its individual members lack. *Brock*, 477 U.S. at 289, 106 S.Ct. 2523. Furthermore, its participation assures "concrete adverseness" and "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Id.* (quoting *Harlem Valley Transp. Ass'n v. Stafford*, 360 F.Supp. 1057, 1065 (S.D.N.Y.1973)).

Indeed, IGC has played an integral part in virtually every stage of this litigation since its inception. It is able to present the legal issues in a unified manner that is highly preferable to having 141 different counsel filing similar, but distinct motions and appeals. Its participation confers the important benefit of focused advocacy and judicial economy articulated in *Brock*.

Furthermore, it is important to recognize that even the Commonwealth's amended complaint speaks of the domain

---

4. The Commonwealth also argues that the facts have changed such that Pocket Kings Ltd. is no longer a proper party, and therefore, that IGC can no longer satisfy the first prong. The evidence relied on by the Com- monwealth is not part of the record before us. We cannot consider evidence that is outside the record. *See Telek v. Daugherty*, 376 S.W.3d 623, 626 (Ky.App.2012).

names and their use in the aggregate. For many intents and purposes, the Commonwealth has treated the domain names as a group. The Commonwealth cannot now turn the tables and ask the Court to require each domain name owner to come forward individually and assert virtually identical legal arguments through separate counsel to resolve threshold, purely legal issues that affect the validity of the entire forfeiture procedure.

## IV. Conclusion

IGC has established that its use of associational standing to intervene in the forfeiture proceedings below is proper and that the trial court's denial of its motion to intervene thus was erroneous. Accordingly, we reverse the Franklin Circuit Court's September 12, 2011, order denying IGC's motion to intervene and remand for actions consistent with this Opinion.

ALL CONCUR.